*408 Opinion for the Court filed by Circuit Judge TATEL.
Opinion concurring in part and dissenting in part filed by Senior Circuit Judge RANDOLPH.
TATEL, Circuit Judge:
Pursuant to its authority to regulate “unfair and deceptive” practices in the airline industry, the Department of Transportation issued a final rule entitled “Enhancing Airline Passenger Protections.” 76 Fed. Reg. 23,110 (Apr. 25, 2011). Spirit Airlines and others challenge three of the rule’s provisions — the requirement that the most prominent figure displayed on print advertisements and websites be the total price, inclusive of taxes (as arbitrary and capricious and a violation of the First Amendment); the requirement that airlines allow consumers who purchase their tickets more than a week in advance the option of canceling their reservations without penalty for twenty-four hours following purchase (as arbitrary and capricious); and the prohibition against increasing the price of air transportation and baggage fees after consumers purchase their tickets (as procedurally defective and otherwise arbitrary and capricious). For the reasons set forth in this opinion, we deny the petitions for review.
I.
Prior to 1978, the federal government regulated the fares airlines could charge and the routes they could fly, and had authority to take administrative action against certain deceptive trade practices. Federal Aviation Act of 1958, Pub. L. No. 85-726, §§ 403-404, 411,1002, 72 Stat. 731, 758-60, 769, 788-91. That changed in 1978 when Congress passed the Airline Deregulation Act, Pub. L. No. 95-504, 92 Stat. 1705, which, among other things, eliminated the government’s ability to set airfares on the theory that “maximum reliance on competitive market forces would best further efficiency, innovation, and low prices as well as variety and quality of air transportation services,” Morales v. Trans World Airlines, Inc., 504 U.S. 374, 378, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) (alteration, omission, and internal quotation marks omitted). Notwithstanding these changes, the government, through the Department of Transportation (DOT), retained authority to prohibit “unfair or deceptive practice^] ... in air transportation or the sale of air transportation.” 49 U.S.C. § 41712(a).
Pursuant to that authority, DOT issued a final rule entitled “Enhancing Airline Passenger Protections.” See 76 Fed. Reg. 23,110. Three of its provisions are at issue in this case.
The first relates to the advertising of airfares. Since 1984, DOT has required that any advertised price for air transportation disclose the “entire price to be paid by the customer to the air carrier.” 49 Fed. Reg. 49,440, 49,440 (Dec. 20, 1984) (codified as amended at 14 C.F.R. § 399.84(a)). Prior to the rulemaking at issue here, DOT allowed airlines to advertise the pre-tax price of tickets provided that the advertisement clearly disclosed the amount of the tax. See 75 Fed. Reg. 32,318, 32,327 (June 8, 2010) (explaining DOT enforcement policy regarding the 1984 rule). For example, airlines could advertise a “$167 base fare + $39 taxes and fees” even though consumers would have to add these two numbers to arrive at the total, final price they would have to pay — $206. DOT reaffirmed this policy in 2006. See 71 Fed. Reg. 55,398, 55,401 (Sept. 22, 2006) (withdrawing Notice of Proposed Rulemaking and retaining status quo). But in the challenged rule, DOT, citing consumer confusion, revised its policy to require airlines to state the total, *409 final price — $206. See 76 Fed. Reg. at 23,166 (amending 14 C.F.R. § 399.84(a)). Under this so-called “Airfare Advertising Rule,” airlines remain free to provide an itemized breakdown (displaying to the customer the amount of the base fare, taxes, and other charges), but they may not display such price components “prominently” or “in the same or larger size as the total price.” Id. In subsequent guidance, DOT explained that airlines may not list price components “in a more prominent place on a webpage or in a print advertisement than the advertised total fare.” Office of Aviation Enforcement & Proceedings, Dep’t of Transp., Answers to Frequently Asked Questions 22 (Oct. 19, 2011), available at http://airconsumer.ost.dot.gov/ rules/E APP_2_FAQ_10-19-2011 .pdf. In other words, to ensure that consumers will clearly understand what final price they will have to pay, the total cost must be the most prominent figure. DOT describes this as a change in “enforcement policy.” See 75 Fed. Reg. at 32,327 (discussing the proposed change).
DOT issued the second challenged provision, the “Refund Rule,” in the context of a broader effort to curb deception and unfairness in the airline industry. Relying on customer feedback and Office of Inspector General reports, 72 Fed. Reg. 65,233, 65,236 (Nov. 20, 2007), DOT found that many airlines failed either to provide consumers with clear customer service plans or to adhere to whatever plans they did provide. Accordingly, DOT ordered U.S. carriers to adopt customer service plans that address a list of topics, including whether the airline “[a]llow[s] reservations to be held without. payment or cancelled without penalty for a defined amount of time.” 74.Fed. Reg. 68,983, 69,003 (Dec. 30, 2009) (amending 14 C.F.R. § 259.5(b)(4)). But in a later rulemaking, the one at issue here, DOT found this insufficient and that further steps were necessary to “ensure that ... plans are specific and enforceable.” 75 Fed. Reg. at 32,323. It found that some airlines had adopted “vague[]” policies that made it “difficult for a consumer to know” what exactly to expect. Id. For example, Allegiant Air’s plan told customers that they could “cancel their reservations up to 24 hours before the scheduled time of departure, but fail[ed] to mention that there are significant fees associated with cancellation.” Letter from Susan Kurland, Assistant Sec’y for Aviation & Int’l Affairs, Dep’t of Transp., to Joanne W. Young & David M. Kirstein, Counsel for Petitioners 6 (July 20, 2011) (denying stay of the rule and explaining DOT’S findings). Responding to such shortcomings, DOT proposed “establishing minimum standards for the plans,” which would “result in consumers being better informed and protected,” 75 Fed. Reg. at 32,323 — the idea being that anything less than the guarantees contained in the rule constitutes an unfair practice or has an unacceptably high risk of deceiving customers. One such requirement, the Refund Rule, directs airlines to allow passengers to cancel reservations without penalty for twenty-four hours “if the reservation is made one week or more prior to a flight’s departure.” 76 Fed. Reg. at 23,165 (amending 14 C.F.R. § 259.5(b)(4)).
Finally, the “Post-Purchase Price Rule” prohibits airlines from “increas[ing] ... the price of the seat,” the “price for the carriage of passenger baggage,” or the “applicable fuel surcharge, after the air transportation has been purchased by the consumer, except in the case of an increase in a government-imposed tax or fee.” Id. at 23,i67 (amending 14 C.F.R. § 399.88(a)). DOT has now advised us that “it will undertake another rulemaking process to assess the appropriateness of applying the rule to ancillary charges other than bag *410 gage charges that traditionally have been included in the price of air transportation” and that “[u]ntil the conclusion of that rulemaking, the agency will only enforce the rule as applied to charges the consumer has already paid, to any charges for carry-on baggage and first and second checked bags, and to mandatory charges like fuel surcharges.” DOT Br. 9.
Spirit Airlines and Allegiant Air (collectively Spirit) claim that all three rules are arbitrary and capricious and that the Airfare Advertising Rule violates the First Amendment rights of airlines to engage in commercial and political speech. Intervening on behalf of petitioners, Southwest Airlines challenges only the Airfare Advertising Rule.
II.
Beginning with their challenge to the Airfare Advertising Rule, the airlines argue that there is nothing inherently deceptive about listing taxes separately and that DOT lacked substantial evidence for concluding that doing so is deceptive in practice. By the airlines’ count, only six commenters suggested that existing airline displays were confusing or misleading, and just two of those pointed to the exclusion of taxes from base fares as the source of their confusion. The airlines also emphasize that in 2010 (the year of the rulemaking), there were only 77 complaints about advertising, as compared, for example, to 3,336 about flight-related problems. Spirit Br. 27 (citing Office of Aviation Enforcement & Proceedings, Dep’t of Transp., Air Travel Consumer Report 42 (Feb. 2011)). Thus, they argue, DOT acted arbitrarily and capriciously when it relied on such scant evidence, particularly given (1) the general norm in the U.S. economy of listing prices exclusive of taxes, (2) DOT precedent rejecting consumer comments about feeling deceived as insufficient to demonstrate deception, and (3) the fact that in 2006, DOT reaffirmed its policy of allowing base-fare advertising (i.e., not requiring airlines to integrate taxes into their advertised fare), even though roughly 500 commenters urged it to depart from that policy, see 71 Fed. Reg. at 55,399, 55,401.
We are unpersuaded. For one thing, DOT left unaltered the rule’s key language (though it did add language allowing airlines to state charges, fees, and taxes separately while prohibiting them from doing so “prominently” or “in the same or larger size as the total price,” 14 C.F.R. § 399.84). Since 1984, DOT has required any advertised price for air transportation to state the “entire price to be paid by the customer to the air carrier.” 49 Fed. Reg. at 49,440 (codified as amended at 14 C.F.R. § 399.84(a)). Because neither Spirit nor Southwest challenges the original rule, the only question before us is whether DOT acted arbitrarily and capriciously when it decided to enforce that rule by requiring that airlines actually add the taxes to the base fare and disclose the total price. In considering this question, “we give substantial deference to an agency’s interpretation of its own regulations, according the agency’s interpretation thereof controlling weight unless it be plainly erroneous or inconsistent with the regulation.” St. Luke’s Hosp. v. Sebelius, 611 F.3d 900, 904 (D.C.Cir.2010) (internal quotation marks omitted). Not only have the airlines offered us no basis for questioning DOT’s interpretation of its rule, but they give short shrift to the record as a whole. In addition to the comments mentioned by the airlines, DOT relied on the following evidence: (1) comments from the original 1984 rulemaking, (2) roughly 500 comments from the 2006 hearing explaining how consumers were being confused by advertisements that itemized price components rather than display a *411 single, total price, and (3) feedback from its “Regulation Room,” an online forum DOT employs to solicit comments. Spirit contests the relevance of the Regulation Room, claiming that DOT framed the issue to elicit comments helpful to its end. But we need not consider the Regulation Room comments because the other two categories of evidence sufficiently support the intuitive conclusion that customers are likely to be deceived by price quotes significantly lower than the actual cost of travel. See Kornman v. SEC, 592 F.3d 173, 184 (D.C.Cir.2010) (“Substantial evidence ... means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.” (internal quotation marks omitted)).
The airlines also challenge DOT’S prohibition on disclosing government taxes and fees “prominently,” arguing that “DOT provides no explanation [for] why the prominent disclosure of taxes and fees would be confusing to consumers,” and that DOT acted arbitrarily and capriciously by “requir[ing] airlines to prominently and conspicuously disclose airline-imposed fees but ... bury[ing] in fine print the taxes and fees that the government itself imposes on air transportation.” Southwest Br. 28-29. DOT responds that it “reasonably declined to allow the airlines to state, with equal prominence, the breakdown of that figure as between base fare, airline-imposed fees, and government taxes and fees.” DOT Br. 27. In addition, it clarifies that its prohibition on prominently stating taxes “ ‘means that the break-out of per-person charges cannot be in a more prominent place on a web page or in a print advertisement than the total advertised fare.’” Id. at 28 (quoting Office of Aviation Enforcement & Proceedings, Dep’t of Transp., Answers to Frequently Asked Questions 22).
DOT has the better argument. Contrary to the airlines’ repeated suggestions, nothing in the Airfare Advertising Rule requires airlines to hide the taxes — or, as Spirit’s website puts it, the “Government’s Cut.” It just requires that the total, final price be the most prominently listed figure, relying on the reasonable theory that this prevents airlines from confusing consumers about the total cost of their travel. This limited imposition hardly amounts to an arbitrary exercise of DOT’S statutory authority to prevent “unfair or deceptive practice^],” 49 U.S.C. § 41712(a). See Petal Gas Storage, LLC v. FERC, 496 F.3d 695, 703 (D.C.Cir.2007) (under the arbitrary and capricious standard of review, an agency “is not required to choose the best solution, only a reasonable one”).
Next, the airlines contend that the Airfare Advertising Rule violates the First Amendment. The parties dispute which standard of review governs: strict scrutiny, applied to laws burdening political speech, FEC v. Wis. Right to Life, Inc., 551 U.S. 449, 464, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007); intermediate scrutiny, as defined in Central Hudson and applied to laws regulating commercial speech, Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm’n of N.Y., 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980); or reasonableness review, as defined in Zauderer and applied to laws requiring “purely factual” disclosures “reasonably related to .the State’s interest in preventing deception of consumers,” Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio, 471 U.S. 626, 651, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985).
The airlines argue that strict scrutiny applies because they have “a First Amendment right to engage in political speech that informs [their] customer base of the huge tax burden that the federal government imposes on air travel.” Southwest *412 Br. 29; see also Spirit Br. 36-37. For support, they point to Consolidated Edison Co. v. Public Service Commission of New York, 447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980), where the Supreme Court invalidated a rule prohibiting utilities from including pro-nuclear energy statements in their invoice envelopes. In doing so, the Court treated the ban as a restriction on political speech, meaning that it had to be “a precisely drawn means of serving a compelling state interest,” id. at 540, 100 S.Ct. 2326. According to the airlines, because they wish to inform then-customers about the large and burdensome taxes imposed on airfare, the Airfare Advertising Rule must also be subject to strict scrutiny. We disagree.
The speech at issue here — the advertising of prices — is quintessential^ commercial insofar as it seeks to “do[ ] no more than propose a commercial transaction,” Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 762, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) (internal quotation marks omitted). According to the airlines, their speech does more than propose a transaction, as it also makes a political point. See also Dissenting Op. at 421 n.2. But where speech “cannot be characterized merely as proposals to engage in commercial transactions,” it is nonetheless commercial in certain circumstances, for instance when it is an “advertisement[ ],” “refer[s] to a specific product,” and the speaker “has an economic motivation” for it. Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 66-67, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983). “The combination of all these characteristics” — undoubtedly present in this case — suffices to classify the speech as “commercial speech” under Bolger. See id. at 67, 103 S.Ct. 2875 (emphasis omitted). As the Court explained there, “advertising which links a product to a current public debate is not thereby entitled to the constitutional protection afforded noncommercial speech.” Id. at 68, 103 S.Ct. 2875 (internal quotation marks omitted). “A company has the full panoply of protections available to its direct comments on public issues, so there is no reason for providing similar constitutional protection when such statements are made in the context of commercial transactions. Advertisers should not be permitted to immunize false or misleading product information from government regulation simply by including references to public issues.” Id. (footnote and citation omitted).
This leaves either the Central Hudson or Zauderer frameworks, and we think the latter applies. The Central Hudson cases have at least two features not fully present here. As the Court recently explained, where, as in this case, laws are “directed at misleading commercial speech,” and where they “impose a disclosure requirement rather than an affirmative limitation on speech,” Zauderer, not Central Hudson, applies, Milavetz, Gallop & Milavetz, P.A. v. United States, - U.S. -, 130 S.Ct. 1324, 1339, 176 L.Ed.2d 79 (2010) — i.e., “an advertiser’s rights are adequately protected as long as disclosure requirements are reasonably related to the State’s interest in preventing deception of consumers.” Zauderer, 471 U.S. at 651, 105 S.Ct. 2265. In Central Hudson itself, an electric utility challenged the constitutionality of a state regulation banning promotional advertising by the utility. 447 U.S. at 558, 100 S.Ct. 2343. The Court explained that because “[t]he First Amendment’s concern for commercial speech is based on the informational function of advertising, ... there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity. The government may ban forms of *413 communication more likely to deceive the public than to inform it.” Id. at 563, 100 S.Ct. 2343. But “[i]f the communication is neither misleading nor related to unlawful activity” — as was the advertising the state had banned in that case — the government “must assert a substantial interest to be achieved, by restrictions on commercial speech.” Id. at 564, 100 S.Ct. 2343. Likewise, in In re R.M.J., 455 U.S. 191, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982), the Court applied intermediate scrutiny to ethics rules that “prohibited attorneys from advertising their practice areas in terms other than those prescribed by the State Supreme Court and from announcing the courts in which they were admitted to practice.” Milavetz, 130 S.Ct. at 1340 (citing In re R.M.J., 455 U.S. at 197-98, 102 S.Ct. 929). As the Court held there, and as it has since explained, there was no reason — in common sense or in experience — to suggest the prohibited “advertisements were themselves likely to mislead consumers.” Id. (citing In re R.M.J., 455 U.S. at 205, 102 S.Ct. 929). In addition, the rule in In re R.M.J. completely prohibited a category of speech (advertising practice areas in non-prescribed terms).
By contrast, in Zauderer the Court faced a rule that, instead of prohibiting speech, simply required a clarifying disclosure. Specifically, the rule required attorneys advertising contingency-fee services “to disclose in their advertisements that a losing client might still be responsible for certain litigation fees and costs.” Id. at 1339 (describing Zauderer, 471 U.S. 626, 105 S.Ct. 2265). The Court concluded that “an attorney’s constitutionally protected interest in not providing the required factual information is ‘minimal.’ ” Id. (quoting Zauderer, 471 U.S. at 651, 105 S.Ct. 2265). In doing so, the Court demanded no evidence that the advertisements would be misleading because, as it explained, “the possibility of deception” in that case was “self-evident.” Zauderer, 471 U.S. at 652-53, 105 S.Ct. 2265 (emphasis added). And in Milavetz, the Court applied the Zauderer standard to uphold a law requiring debt relief agencies to “ ‘clearly and conspicuously disclose in any advertisement of bankruptcy assistance services ... that the services or benefits are with respect to bankruptcy relief ” and to include the following, “ ‘or a substantially similar statement’ “ ‘We are a debt relief agency. We help people file for bankruptcy relief under the Bankruptcy Code.’” Milavetz, 130 S.Ct. at 1330 (quoting 11 U.S.C. § 528(a)(3), (4)). Citing Zauderer, the Court explained that the government had no need to produce “evidence that [the] advertisements are misleading” because, based on experience and common sense, the “likelihood of deception” in that case was “hardly a speculative one.” Id. at 1340 (internal quotation marks omitted).
As in the Zauderer cases and unlike in the Central Hudson cases, the Airfare Advertising Rule targets misleading speech and does not constitute what the case law defines as an affirmative limitation on speech. To begin with, the government, as in Milavetz, had no need to produce additional “evidence that [the] advertisements are misleading” because the “likelihood of deception” here is “hardly ... speculative,” id. (internal quotation marks omitted). Based on common sense and over three decades of experience and complaints, DOT concluded that it was deceitful and misleading when the most prominent price listed by an airline is anything other than the total, final price of air travel. Disclosure requirements, moreover, are not the kind of limitations that the Court refers to when invoking the Central Hudson standard of review. To be sure, the airlines claim that the rule here imposes an affirmative limitation on speech be *414 cause it requires them to post the total, final price in the most prominent manner, thus prohibiting them from posting other numbers as prominently or more prominently than the total, final price. But by mentioning affirmative limitations on speech, the Court was referring to rules that prohibit certain kinds of speech — like the one in In re R.M.J., which flatly “prohibited attorneys from advertising their practice areas in terms other than those prescribed by the State Supreme Court and from announcing the courts in which they were admitted to practice.” Milavetz, 130 S.Ct. at 1340 (citing In re R.M.J., 455 U.S. at 197-98, 102 S.Ct. 929); see also Thompson v. W. States Med. Ctr., 535 U.S. 357, 360, 368, 122 S.Ct. 1497, 152 L.Ed.2d 563 (2002) (applying intermediate scrutiny to a law prohibiting providers of “compounded drugs” from advertising or promoting particular drugs); Central Hudson, 447 U.S. 557, 100 S.Ct. 2343 (intermediate scrutiny for a law prohibiting promotional advertising by electric utilities); Virginia State Bd., 425 U.S. at 773, 96 S.Ct. 1817 (rejecting state statute that “completely suppressed] the dissemination of concededly truthful information about entirely lawful activity”). By contrast, the Airfare Advertising Rule does not prohibit airlines from saying anything; it just requires them to disclose the total, final price and to make it the most prominent figure in their advertisements. Though limiting the manner in which airlines may advertise information, this neither prohibits nor significantly burdens airlines’ ability to provide that information.
And indeed they do. For example, Spirit’s website prominently displays “Our Price” — broken down into “Base Fare + Fuel” — and then adds, with a plus sign, “Government’s Cut,” which is displayed clearly and separately, and then finally provides, in slightly larger font, the “Total Price.” See Appendix A (a screenshot of a sample flight advertised on Spirit’s website). The website also separately states, underlined and in bold, the “government tax rate” for each flight price quote, so that consumers know the tax burden in both absolute and relative terms. Moreover, a bright orange link (in the form of a question mark) appears next to • each of those price components — i.e., “Base Fare,” “Fuel,” and “Government’s Cut” — and if one clicks that link, the site provides a further breakdown of what makes up the cost of airfare. For example, the base fare on domestic flights generally includes the cost of “Flight,” a “Passenger Usage Fee,” and what Spirit labels a fee for the “Unintended Consequences of DOT Regulations.” See generally Spirit, www.spirit. com (last search conducted on June 6, 2012); see also Oral Arg. Rec. 32:37-33:05 (government attorney acknowledging that Spirit’s current website is compliant with the new enforcement policy). All of this demonstrates what the rule’s text already tells us: the rule is aimed at providing accurate information, not restricting it. Nothing in the rule prohibits the airlines from separately alerting the public to the taxes imposed on air transportation, much as the utility in Consolidated Edison, 447 U.S. 530, 100 S.Ct. 2326, advised its customers of its support for nuclear energy. The airlines can even call attention to taxes and fees in their advertisements; what they cannot do is call attention to them by making them more prominent than the total, final price the customer must pay.
Having determined that the Zauderer standard applies, we have no doubt that DOT’S final rule, which requires the total, final price to be the most prominently listed figure, is “ ‘reasonably related to the [government’s] interest in preventing deception of consumers.’ ” Milavetz, 130 S.Ct. at 1340 (quoting Zauderer, 471 U.S. at 651, 105 S.Ct. 2265). The rule aims to *415 prevent consumer confusion about the total price they have to pay, and it goes without saying that requiring the total price to be the most prominent number is reasonably related to that interest.
The dissent disagrees, arguing that the rule fails under the Central Hudson test. To reach that conclusion, the dissent says that the rule bans airlines “from displaying taxes and fees prominently.” Dissenting Op. at 421 (internal quotation marks omitted). But DOT interprets the rule to mean only that the “ ‘break-out of per-person charges cannot be in a more prominent place on a web page or in a print advertisement than the total advertised fare,’ ” such as “ ‘at the top of the page, ahead of the total price,’ ” or with “ ‘special highlighting that sets it apart and makes it more prominent than the total price,’ ” DOT Br. 28-29 (quoting Office of Aviation Enforcement & Proceedings, Dep’t of Transp., Answers to Frequently Asked Questions 22). We owe “substantial deference” to the government’s interpretation of its own rule, “according [it] controlling weight unless it be plainly erroneous or inconsistent with the regulation,” see St. Luke’s Hosp., 611 F.3d at 904 (internal quotation marks omitted). Confirming this interpretation, government counsel stated at oral argument that Spirit’s website, which displays taxes and fees vividly, see Appendix A, is fully compliant with the rule. See Oral Arg. Rec. 32:37-33:05.
So interpreted, the rule satisfies even the Central Hudson test. That test requires that we ask three questions. First, is the asserted government interest substantial? Central Hudson, 447 U.S. at 566, 100 S.Ct. 2343. This is easy. The Supreme Court has already held that “[f]or purposes of [the Central Hudson ] test, there is no question that [the government’s] interest in ensuring the accuracy of commercial information in the marketplace is substantial,” Edenfield v. Fane, 507 U.S. 761, 769, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993). The second and third inquiries are related: “whether the regulation directly advances the governmental interest asserted,” Central Hudson, 447 U.S. at 566, 100 S.Ct. 2343, and “whether the fit between the government’s ends and the means chosen to accomplish those ends ‘is not necessarily perfect, but reasonable,’ ” Pearson v. Shalala, 164 F.3d 650, 656 (D.C.Cir.1999) (quoting Bd. of Trs. of the State Univ. of N.Y. v. Fox, 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989)). These too are easy. The government interest — ensuring the accuracy of commercial information in the marketplace — is clearly and directly advanced by a regulation requiring that the total, final price be the most prominent. Moreover, such a regulation appears reasonably tailored to accomplish that end. Unlike in other cases — where the government expressly prohibits certain kinds of speech on the premise that consumers need government to protect them from accurate information, see Bates v. State Bar of Ariz., 433 U.S. 350, 375, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977) (“[W]e view as dubious any justification that is based on the benefits of public ignorance.”); cf. 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 503, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996) (opinion of Stevens, J.) (“The First Amendment directs us to be especially skeptical of regulations [of truthful, non-misleading information] that seek to keep people in the dark for what the government perceives to be their own good.”)— the rule simply regulates the manner of disclosure. It imposes no burden on speech other than requiring airlines to disclose the total price consumers will have to pay. This the First Amendment plainly permits.
*416 III.
Next, we address Spirit’s challenge to the Refund Rule, which allows consumers to cancel reservations without penalty for twenty-four hours provided that they made those reservations more than a week in advance of the flight. Spirit argues that the rule violates the Airline Deregulation Act, which prohibits regulation of fares. It also argues that “DOT did not make a finding or even discuss the possibility that charging a cancellation penalty is deceptive” or unfair. Spirit Br. 49-50. Finally, Spirit points out that cancellation penalties allow airlines to ensure that their planes are full. Without cancellation penalties, consumers could book several seats to cover their contingencies, cancel, and get full refunds, leaving the airlines with insufficient time to rebook.
Again, we are unpersuaded. For one thing, the rule has nothing to do with airfares. Instead, it regulates cancellation policies on the basis of a finding that existing practices were deceptive and unfair — a regulation plainly allowed under 49 U.S.C. § 41712 so long as it “was reasonable and ... supported by substantial evidence in the record,” Nat’l Ass’n of State Util. Consumer Advocates v. FCC, 372 F.3d 454, 461 (D.C.Cir.2004). It was. DOT’s finding of deception and unfairness in the context of an ongoing effort to reduce unfairness in the industry rests on over a decade’s worth of recorded experience. DOT found that airlines were routinely misleading consumers with vague customer service policies. One manifestation of that unfairness, DOT found, was that consumers were led to expect, based on widespread advertising and general practices, that they may cancel reservations without penalty for twenty-four hours only to have that expectation thwarted by airlines with vague policies that often departed from this practice. Viewing this as unfair and deceptive, DOT now requires airlines to meet a basic set of customer service guarantees — guarantees that it crafted after canvassing industry norms and gauging consumer expectations. Finally, DOT took account of Spirit’s concern about ensuring that its planes are full: it amended the proposed rule to apply only if seats are purchased more than a week in advance, thus allowing airlines at least that much time to rebook.
In sum, Spirit gives us no reason to believe that the Refund Rule- — developed as part of a systematic effort aimed at preventing unfair and deceptive practices — is arbitrary or capricious. See Petal Gas Storage, 496 F.3d at 703 (agencies “[are] not required to choose the best solution, only a reasonable one”).
IV.
This brings us, finally, to the Price Rule, which prohibits airlines from increasing the price of air transportation after consumers purchase their tickets. Because of some dispute as to whether the rule applies to ancillary charges, such as in-flight refreshments, DOT has informed us that it “will undertake a new notice-and-comment procedure before enforcing the post-purchase price increase provision to any ancillary service other than the carriage of carry-on baggage and the first and second checked bag.” DOT Br. 51. Taking DOT at its word, we agree that the only issue before us is whether DOT appropriately prohibited airlines from raising the price of airline tickets, carry-on luggage, or the first two checked bags after customers buy their tickets.
According to Spirit, the Price Rule is procedurally unlawful because the final rule was not “a logical outgrowth of its notice” of proposed rulemaking. See CSX Transp., Inc. v. Surface Transp. *417 Bd., 584 F.3d 1076, 1079 (D.C.Cir.2009) (internal quotation marks omitted). In the Notice of Proposed Rulemaking, DOT explained it was considering prohibiting airlines “from raising the price after the consumer completes the purchase.” 75 Fed. Reg. at 32,330. Given this, Spirit tells us that it “reasonably believed the proposal would prohibit the collection of additional amounts for a ticket after the passenger purchased a ticket, or for an optional service such as a checked bag or seat selection after the passenger paid for the optional service.” Spirit Br. 53. Until the final rule was promulgated, it had no idea “that DOT also intended to prohibit price increases for optional services, which a passenger can select after he buys a ticket, before the passenger purchases them.” Id. at 53-54. Thus, DOT failed to give adequate “notice of the scope and general thrust of the proposed rule.” Id. at 56. (internal quotation marks omitted).
This argument is ridiculous. As the government points out, the proposed rule deemed it an unfair and deceptive practice for a “seller of scheduled air transportation ... to increase the price of that air transportation to a consumer, including but not limited to increase in the price of the seat, increase in the price for the carriage of passenger baggage, or increase in an applicable fuel surcharge, after the air transportation has been purchased by the consumer.” 75 Fed. Reg. at 32,341 (emphasis added). The final rule adopted the same operative language with the following amendments: (1) adding “except in the case of an increase in a government-imposed tax or fee,” and (2) specifying that a “purchase is deemed to have occurred when the full amount agreed upon has been paid by the consumer.” 76 Fed. Reg. at 23,167 (amending 14 C.F.R. § 399.88(a)).
Spirit next argues that the Refund Rule is arbitrary and capricious. According to Spirit, DOT based the rule on its concern that “some air tour operators (who were also subject to the notice requirements) ... were burying consumer notices about the possibility of price increases in their conditions of carriage.” Spirit Br. 57. But, Spirit argues, this has no relationship to raising the price of an optional service before a consumer purchases it — especially given that “under the status quo, airlines are prohibited from increasing prices without first giving consumers notice prices could go up.” Id. at 58. In addition, Spirit points out, “a passenger can protect himself against future price increases by purchasing optional services at the same time as (or as soon as possible after) he purchases his ticket.” Id. at 59. But DOT saw this as a classic bait and switch. It found that when consumers purchase airline tickets, they assume that the price they pay for extra bags at the airport will be the price advertised when they bought their ticket. Thus, DOT concluded, increasing the price of these very commonly purchased and practically necessary services (like the ability to carry bags onto the flight) amounts to an unfair practice. Under the APA, we ask only whether DOT’S conclusion “was reasonable and ... supported by substantial evidence in the record.” Nat’l Ass’n of State Util. Consumer Advocates, 372 F.3d at 461. It was.
y.
For the foregoing reasons, the petitions for review are denied.

So ordered.

*418 [[Image here]]
*419 [[Image here]]